# IN THE SUPREME COURT OF IOWA

No. 17 / 05-0340

Filed July 13, 2007

**NORTHWEST INVESTMENT CORP.**,

      Appellant,

vs.

**EMMETT LEE WALLACE, WILLIAM R. HARVEY and HELEN I. HARVEY,**

      Appellees.

_____

Appeal from the Iowa District Court for Scott County, David E. Schoenthaler, Judge.

Corporation appeals district court's determination of "fair value" in an appraisal action following a reverse stock split. **AFFIRMED.**

John F. Lorentzen of Nyemaster, Goode, West, Hansell & O'Brien, P.C., Des Moines, for appellant.

Terry M. Giebelstein of Lane & Waterman, LLP, Davenport, for appellee Emmett Lee Wallace.

Steven H. Jacobs of Betty, Neuman & McMahon, LLP, Davenport, for appellees Harveys.

**STREIT, Justice.**

"This is a story about control."[1]  Minority shareholders who were required to redeem their shares after a reverse stock split refused to accept the corporation's offer to buy back their shares.  They complained the offer did not include the additional amount a buyer would theoretically pay to own a controlling interest in the corporation.  The district court held the proper valuation of the minority shareholders' stock included a control premium.  On appeal, we must determine (1) whether Iowa's statute requiring a corporation in a reverse stock split to pay the shareholders "fair value" for their shares permits the addition of a control premium; and if so (2) whether there is substantial evidence to support the addition of a control premium in this case.  We find Iowa's statutory definition of "fair value" implicitly requires the shares to be valued on a marketable, control basis.  Because the minority shareholders presented credible evidence the corporation could obtain a significant control premium in the event of a sale, we affirm.

### I.  Facts and Prior Proceedings.

Dr. Emmett Lee Wallace, William R. Harvey, and Helen I. Harvey (collectively the "minority shareholders") once owned stock in River Cities Investment Co.  Wallace owned approximately 7.1% of the outstanding shares (35,196) and the Harveys owned approximately 1.5% (7,291).  The balance of the outstanding shares was owned by Northwest Investment Corp.

River Cities' principal asset was the indirect ownership of stock in Northwest Bank and Trust Company ("bank").  River Cities owned 100% of the Northwest Bank Holding Company, which in turn owned 84% of the

---

[1]Janet Jackson, *Control, on* Control (A & M Records 1986).

bank. In addition, Northwest Bank Holding Company owned other assets, including a $2,400,000 note receivable and $455,000 in deferred tax debits.

In September 2003, at a special meeting, River Cities' shareholders adopted by resolution the first amendment to the Amended and Restated Articles of Incorporation of River Cities. The amendment provided the aggregate number of shares the corporation may issue is limited to 200 shares of common stock.[2] This action reduced the aggregate number of outstanding shares which had previously been 496,507. As a result of this amendment, the minority shareholders became owners of fractional shares of new stock. The amendment provided no fractional shares would be issued; any fractional shares created would be acquired for cash. The amendment effectively forced the minority shareholders to sell their shares back to River Cities.

River Cities' board of directors determined the fair value of the old stock was $33.23 per share immediately before the reverse stock split. This figure was based on an appraisal prepared by Wayne Brown of Clifton Gunderson LLP.

Shortly after the special meeting, River Cities merged into Northwest Investment (the majority shareholder). Northwest Investment then timely paid the minority shareholders $33.23 per share of old stock plus interest from the date of the resolution adopting the first amendment. It also gave the minority shareholders notice of their appraisal rights as required by Iowa Code section 490.1324 (2003).

The minority shareholders made a timely demand for further payment under Iowa Code section 490.1326. They demanded $64 per share for their old stock. This demand was based on an appraisal prepared by Richard F. Maroney, Jr. of Austin Associates, LLC. The shareholders timely tendered

_____

[2]This is commonly referred to as a reverse stock split.

the certificates representing their shares of the old stock for transfer to Northwest Investment.

Northwest Investment received the minority shareholders' demand for additional payment but disagreed with the minority shareholders' valuation. Consequently, Northwest Investment brought this action in February 2004. *See* Iowa Code § 490.1330 (if the corporation refuses shareholder's demand for additional payment, then it must commence a proceeding within sixty days after receiving payment demand and petition the court to determine fair value).

After initiating this action, Northwest Investment's board of directors requested a second appraisal from Clifton Gunderson. Ronald E. Nielsen of Clifton Gunderson completed his appraisal report in August 2004. He concluded the fair value of the old stock immediately prior to the reverse stock split was $48 per share.

Based on Nielsen's appraisal, Northwest Investment paid the minority shareholders an additional $14.77 per share, which is the difference between $33.23 and $48. Northwest Investment also paid interest to the minority shareholders, which is required by law. Northwest Investment made these payments to the minority shareholders without prejudice to their right to appraisal in this action. The minority shareholders refused to accept $48 per share as full payment for their old stock in River Cities.

The case was tried to the district court. The district court found Maroney's testimony more credible and adopted his opinion that the fair value of the old stock was $64. The district court denied both parties' requests for attorney fees.

Northwest Investment appealed. On appeal, Northwest Investment argues (1) the district court erred by adopting Maroney's appraisal because he included a premium for control in his valuation and (2) the district court

erred by not awarding Northwest Investment attorney fees and expert witness expenses.

## II. Scope of Review.

Actions to determine the value of stock pursuant to section 490.1330 are at law. *Sieg Co. v. Kelly* (*Sieg II*), 568 N.W.2d 794, 797 (Iowa 1997) (citing *Sieg Co. v. Kelly* (*Sieg I*), 512 N.W.2d 275, 278 (Iowa 1994)). Our review is for errors of law. *Id.* (citing *Sieg I*, 512 N.W.2d at 278). The district court's findings of fact are binding on us if supported by substantial evidence. *Id.* (citing Iowa R. App. P. 14(f)(1) (now Rule 6.14(6)(*a*))).

## III Merits.

**A. Control Premium.** The principal differences between the appraisers' conclusions of value stem from their use of control premiums and Maroney's use of guideline transactions involving sale-of-control data. Northwest argues Maroney's inclusion of a control premium is unwarranted because Northwest Bank is a well-run, efficient bank. According to Northwest, a control premium is justified only if there is "substantial evidence of the inefficient use of assets of the company being appraised." Northwest also claims Maroney's "control premium" is really an impermissible award of "synergistic value." Before addressing the evidence of this case, we must first determine whether the addition of a control premium is permissible under Iowa Code section 490.1301(4).

1. *Fair value.* Iowa Code chapter 490 gives a shareholder "appraisal rights" and the right to obtain "fair value" for his or her shares upon the occurrence of enumerated corporate action, including a reverse stock split. Iowa Code § 490.1302(1)(*d*). The corporation must commence an action to determine the fair value of the minority shareholder's stock if the shareholder and corporation cannot agree on a price. *Id.* § 490.1330.

Under Iowa Code section 490.1301(4), "fair value" means:

> the value of the corporation's shares determined according to the following:
>
>  *a.* Immediately before the effectuation of the corporate action to which the shareholder objects.
>
>  *b.* Using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal.
>
>  *c.* Without discounting for lack of marketability or minority status . . . .
>
> With respect to shares of a corporation that is a bank holding company as defined in section 524.1801, the factors identified in section 524.1406, subsection 3, paragraph "*a*", shall also be considered in determining fair value.[3]

We have repeatedly stated there is no predominant, perfect formula for arriving at fair value. *Sieg II*, 568 N.W.2d at 798; *Sec. State Bank v. Ziegeldorf*, 554 N.W.2d 884, 888 (Iowa 1996); *Sieg I*, 512 N.W.2d at 278; *see also* Model Bus. Corp. Act § 13.01 cmt. 2, at 13-9 (2005) (stating subsection (b) "adopts the accepted view that different transactions and different contexts may warrant different valuation methodologies"). We have recognized three popular approaches to appraising stock: market value, investment value, and net asset value. *Sieg I*, 512 N.W.2d at 278 (citing *Richardson v. Palmer Broad. Co.*, 353 N.W.2d 374, 378 (Iowa 1984)). "The usefulness of any particular approach depends on the facts and circumstances of each case." *Sieg II*, 568 N.W.2d at 798 (citing *Ziegeldorf*, 554 N.W.2d at 889). Each method is "designed to independently produce the full measure of the fair value of the stock rather than a component of fair value." *Richardson*, 353 N.W.2d at 378–79. Moreover, "[m]odern valuation methods will normally result in a range of values, not a particular single value." Model Bus. Corp. Act § 13.01 cmt. 2, at 13-9. "The court

---

[3]The parties agree River Cities was not a bank holding company within the meaning of Iowa Code § 524.1801. Therefore, the last sentence of the definition is not relevant.

should consider any relevant factor not inconsistent with the statutory definition of 'fair value.' " *Sieg II*, 568 N.W.2d at 798. Factors to be considered include:

> the rate of dividends paid, the security afforded that dividends will be regularly paid, the possibility that dividends will be increased or diminished, the size of the accumulated surplus applicable to the payment of dividends, the record of the corporation, its prospects for the future, the selling price of stocks of like character, the value of its assets, book values, market conditions, the reputation of the corporation, and all relevant factors that may influence the valuation.

*Sieg I*, 512 N.W.2d at 279 (citing *Robbins v. Beatty,* 246 Iowa 80, 91, 67 N.W.2d 12, 18 (1954)).

The Iowa legislature adopted the current definition of fair value in 2002. 2002 Iowa Acts ch. 1154, § 78. The definition is derived from the 1999 amendment to section 13.01(4) of the Model Business Corporation Act ("MBCA").[4] The 1999 amendment to section 13.01(4) expressly prohibits "discounting for lack of marketability or minority status." Prior to the change, the MBCA's definition was silent on whether such discounts were appropriate. Consequently, courts interpreting statutes based on the MBCA's previous definition were split on the issue of discounts. *Compare Atl. States Constr., Inc. v. Beavers*, 314 S.E.2d 245, 250–51 (Ga. Ct. App. 1984) (holding minority discount is permissible); *Columbia Mgmt. Co. v. Wyss*, 765 P.2d 207, 213 (Or. Ct. App. 1988) (holding marketability discount is proper but a minority discount is inappropriate), *with Hansen v. 75 Ranch Co.*, 957 P.2d 32, 41 (Mont. 1998) (holding minority discount is not appropriate); *Hogle v. Zinetics Med., Inc.*, 63 P.3d 80, 90–91 (Utah 2002)

---

[4]The last unnumbered paragraph of Iowa Code section 490.1301(4), which defines fair value, is not derived from the MBCA. It originated in a 2000 amendment to the Iowa Code. *See* 2000 Iowa Acts ch. 1211, § 2.

(holding discounts based on lack of marketability and lack of control are impermissible).

In comments accompanying the 1999 amendment, the MBCA states

valuation discounts for lack of marketability or minority status are inappropriate in most appraisal actions, both because most transactions that trigger appraisal rights affect the corporation as a whole and because such discounts give the majority the opportunity to take advantage of minority shareholders who have been forced against their will to accept the appraisal-triggering transaction.

Model Bus. Corp. Act § 13.01 cmt. 2, at 13-10.

Although six other states[5] have adopted the MBCA's current definition of fair value with respect to appraisal rights, no appellate court in these jurisdictions has been asked to determine whether "fair value" may include a control premium. For guidance we turn to the official comments following MBCA section 13.01. *See Richardson*, 353 N.W.2d at 376–77 (referring to an earlier official comment to the MBCA).

Subsection (c) prohibits discounting for lack of marketability or minority status. The official comment explains subsection (c) is "designed to adopt a more modern view that appraisal should generally award a shareholder his or her *proportional interest in the corporation after valuing the corporation as a whole*, rather than the value of the shareholder's shares when valued alone." Model Bus. Corp. Act § 13.01 cmt. 2, at 13-10 (emphasis added); *see Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989) (stating the corporation must be valued as an entity before determining the shareholder's proportionate interest). If an appraiser is valuing the corporation as a whole, then a control premium is certainly

---

[5]The six other states are Connecticut, Idaho, Maine, Mississippi, Virginia, and West Virginia. *See* Conn. Gen. Stat. § 33-855(4); Idaho Code Ann. § 30-1-1301(4); Me. Rev. Stat. Ann. tit. 13-C, § 1301(4); Miss. Code Ann. § 79-4-13.01(4); Va. Code Ann. § 13.7-729; W. Va. Code § 31D-13-1301(4). Florida has adopted a variation of the new MBCA definition. *See* Fla. Stat. § 607.1301(4).

proper. A control premium is the additional consideration an investor would pay over the value for a minority interest in order to own a controlling interest in the common stock of a company. Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 349 (4th ed. 2000) (quoting *Control Premium Study*, 4th quarter 1999 (Los Angeles: Applied Financial Information, LP, 1990), p. ii). "A controlling interest is considered to have greater value than a minority interest because of the purchaser's ability to effect changes in the overall business structure and to influence business policies." *Id.*

Our legislature made a policy decision when it adopted the current definition of "fair value." By not allowing a discount for lack of marketability or minority status, the legislature implicitly required shares to be valued on a marketable, control interest basis. We therefore hold a control premium may be considered in determining fair value if supported by the evidence. *See Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 804 (Del. 1992) (holding the trial court improperly refused to add a control premium to publicly traded equity value of corporation's shares for each of the corporation's operating subsidiaries in determining valuation in an appraisal action); *Borruso v. Commc'ns Telesystems Int'l*, 753 A.2d 451, 457–58 (Del. Ch. 1999) (adding thirty percent premium because comparable company analysis reflects inherent minority discount); *In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.*, 725 A.2d 927, 935 (Vt. 1999) (thirty percent premium for control added to adjust for trading price of minority shares); *Casey v. Brennan*, 780 A.2d 553, 571 (N.J. Super. Ct. App. Div. 2001) (concluding "that in a valuation proceeding a control premium should be considered in order to reflect market realities"). We now turn to the dueling appraisals in this case.

2. *Nielsen's appraisal.* Nielsen was Northwest Investment's appraiser. He is a Certified Public Accountant and partner at Clifton Gunderson. He is also an Accredited Senior Appraiser. Nielsen primarily relied on an income approach in determining the value of the bank. An income approach assumes the value of the company is derived from the generation of income. In taking this approach, Nielsen employed a capitalization-of-earnings method. Capitalization of earnings involves an estimation of the company's ongoing net earnings and a determination of the risks associated with generating those earnings (capitalization rate).

Additionally, Nielsen used a market-based approach to valuing the bank. A market-based approach values a company with factors derived from comparable companies that are publicly traded. The particular method Nielsen employed was the guideline company method for price-to-book value. This method derives an estimated price-to-book multiple from the stock price of publicly traded guideline companies as compared to their book values. Nielsen applied the multiple to his opinion of the adjusted book value of the bank. To this figure, he added a 15% control premium. Nielsen reasoned the premium was necessary because the stock prices used in this method reflect a minority interest price.[6]

To determine the final value of River Cities, Nielsen combined the two approaches. He gave 90% weight to the income method figure and 10% weight to the market-based method figure. Nielsen then "rolled up" his combined value into Northwest Bank Holding Company and ultimately River Cities, based on its 84% ownership of the bank. To this figure, Nielsen added the value of the other assets owned by Northwest Bank Holding

---

[6]On appeal, Northwest Investment argues it was improper for Nielsen to add a control premium to his market based valuation. According to Northwest Investment, the control premium only represents 60¢ of Nielsen's $48 valuation conclusion.

Company.[7] Nielsen then rolled up this net value into River Cities based on River Cities' direct ownership of 100% of Northwest Bank Holding Company. Finally, he divided his conclusion, which valued River Cities as a whole, by the number of outstanding shares in River Cities and arrived at a value of $48 per share for the old stock.

3. *Maroney's appraisal.* Maroney, who was hired by the minority shareholders, is a principal of Austin Associates, a bank consulting firm. He has a Master's degree in Business Administration. Maroney used a combination of valuation methods in his appraisal of River Cities. Maroney used a discounted cash flow ("DCF") method, which is a type of income approach valuation. The DCF method uses the same basic components of the capitalization-of-earnings method. In addition, it includes a projection of future value from net earnings and a residual value at the end of the projected period, which must be discounted to present value.

Maroney also utilized a market-based approach. He considered two types of guideline transactions: transactions of publicly traded stock and transactions involving the sale of financial companies to other companies or groups (i.e. sale of control). He created a price-to-tangible book value ratio and a price-to-earnings multiple for each guideline type to determine River Cities' value.

Through these methods Maroney arrived at a total of five different values for River Cities (one for the DCF method, two using guideline transactions of publicly traded stock, and two using guideline transactions for sale of control of financial institutions). For each of these values,

---

[7]Nielsen utilized the net asset method to determine the value of these other assets. This method sums the value of the assets and subtracts the liabilities associated with those assets.

Maroney divided by the number of outstanding shares of old stock (496,507).

Next, Maroney added a 40% control premium to three of the five values—the DCF value and the two values based on guideline transactions of publicly traded stock. At trial, Maroney defined control premium as the "amount another organization or another group of people would pay to get control—controlling interest in a financial institution or any company." He explained the addition of a control premium is necessary to convert a "marketable, minority interest" value to a "marketable controlling interest" value. According to Maroney, the two values based on guideline transactions for sale of control of financial institutions do not require the addition of a control premium because control is already embedded in the values. To determine the appropriate control premium, Maroney reviewed bank and thrift sale transactions since 2001 (169 transactions). Maroney determined the percentage of the sale price representing control premium by comparing the announced sale price to the pre-announced stock price of the selling institution. The median control premium for all bank sales since 2001, using stock prices one month prior to the sale, was 41.2%. The median result for all thrift sales was 36.4%. Control premiums using the stock price three months prior to the sale were 52.1% for banks and 44.3% for thrifts. Maroney found the bank results more applicable to River Cities due to Northwest Bank's strong commercial lending. Accordingly, he selected 40% to use for a control premium in valuing River Cities.

Maroney's five values for a single share of old River Cities stock were:

**Discounted Cash Flow with Control Premium**   $57.73

**Guideline Transactions:**

    **Publicly Traded Stocks with Control Premium**

        Price-to-Tangible Book Value Ratio   $61.03

| | |
|---|---|
| Price-to-Earnings Multiple | $72.99 |

**Sale of Control**

| | |
|---|---|
| Price-to-Tangible Book Value Ratio | $61.36 |
| Price-to-Earnings Multiple | $69.52 |

To reach a final fair value determination, Maroney considered a simple average of the results ($64.53), the average of the three methods after averaging the two results in each of the guideline approaches ($63.39), the average of the three results after excluding the high and low ($63.97) and the median value ($61.36). Maroney ultimately determined the fair value of River Cities' stock was $64 per share.

The district court found Maroney's appraisal more credible than Nielsen's. The court noted Nielsen's appraisal was significantly lower than recent appraisals done by Clifton Gunderson (Nielsen's employer) for the bank's employee stock option plan and the bank's own reverse stock split. The court found these multiple inconsistent appraisals of substantially the same assets difficult, if not impossible, to reconcile. Second, the court found no rational basis for the percentage weighting given by Nielsen to the valuation methods he used. Finally, the court disagreed with Nielsen's position that a well-run, high performing business, such as the bank, should either have no or very little control premium added to determine fair value. The district court adopted Maroney's opinion that $64 was the fair value of the minority shareholders' old stock. We must decide whether Maroney's addition of a control premium was appropriate in this case.

4. *Applied methods of valuation.* On appeal, Northwest alleges Maroney made several errors in his fair value determination. Northwest contends well-run companies typically do not command a control premium. At trial, Nielsen testified a buyer is willing to pay a larger premium to gain control of a poorly-run company due to the ability to eliminate inefficiencies

and increase profits. Maroney, on the other hand, testified a well-run company is just as likely to obtain a significant control premium. He stated:

> I think the fact that a company is highly profitable most likely means that they are going to have more interest from more buyers and more competition for the company and I don't find that to affect control premium at all.

The district court found Maroney more credible on this point, and we see no reason to disturb the court's finding.

Next, Northwest contends Maroney should have placed greater emphasis on the income approach and less emphasis on the market-based approach. According to Northwest, "[w]hen financial data of the company being appraised is reliable, the principal method for determining fair value is the income approach." Northwest argues "market-based valuation methods, which inherently reflect synergies, should be given little or no weight."

However, Maroney testified he considered each of the five methods he used in this case to be valid and appropriate. He noted he preferred using a variety of methods because there is a degree of uncertainty with respect to the income approach, which is based on projections. Like the district court, we see no reason to overemphasize the income approach. The market approach to valuation provided helpful, additional evidence regarding the value of the bank and by extension River Cities. *See* Shannon Pratt, *The Lawyer's Business Valuation Handbook* 105 (2000) (noting that while in theory the income approach is the dominant approach in business valuation, Revenue Ruling 59-60 and many investment bankers also put heavy emphasis on the market approach).

Northwest also argues it was error for Maroney to add a control premium to his income approach.[8]  In support of this contention, Northwest provides the following quote from a Delaware case:

> The discounted cash flow method purports to represent the present value of [the corporation]'s cash flow.  The calculation arguably may have left out a premium that normally accrues when shareholders sell a company.  However, "the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred."  Plaintiff is not entitled to the proportionate sales value of [the corporation].  Plaintiff is entitled to the proportionate value of [the corporation] as a *continuing shareholder.*  The discounted cash flow analysis, as employed in this case, fully reflects this value without need for an adjustment.

*In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 494 (Del. Ch. 1991) (citations omitted).  While this position may be the law in Delaware, we choose to follow the position of jurisdictions who determine fair value based on "what a willing buyer realistically would pay for the enterprise as a whole on the statutory valuation date."  *BNE Mass. Corp. v. Sims*, 588 N.E.2d 14, 19 (Mass. App. Ct. 1992); *see In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1004 (Me. 1989) (stating the district court must determine "the best price a single buyer could reasonably be expected to pay for the firm as an entity" and then "prorate[] that value for the whole firm equally among all shares of its common stock"); *Trapp Family Lodge, Inc.*, 725 A.2d at 931 (same); *see also* Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L. J. 613, 654–55 (Feb. 1998) (advocating third party sales value, i.e. the price at which the corporation as an entity could be sold to a third party in an arm's length transaction, should be a factor to consider in

---

[8]Northwest does not explain why its first appraiser, Wayne Brown, added a 35% control premium to his income approach valuation.

determining "fair value"); 2 American Law Inst., *Principles of Corporate Governance: Analysis and Recommendations* § 7.22(c) (1994) ("[T]he court generally should give substantial weight to the highest realistic price that a willing, able, and fully informed buyer would pay for the corporation as an entity."). To hold otherwise "would inevitably encourage corporate squeeze-outs." *McLoon Oil Co.*, 565 A.2d at 1005. Thus, we find nothing wrong with Maroney adding a control premium to his DCF valuation nor do we quarrel with his use of guideline transactions involving the sale of control. As Maroney's research indicates, buyers are willing to pay a large premium when purchasing an entire financial institution as opposed to a minority interest. The minority shareholders are entitled to the proportionate share of the control premium River Cities likely would obtain if the corporation were for sale.

5. *Synergy.* Northwest Investment also complains Maroney's control premium is inflated with synergistic value because the market data, upon which the premium is based, included corporate mergers. Synergistic value arises "when two assets are more valuable in combination than in isolation or, put otherwise, when two assets are more valuable when controlled by the same firm than when controlled by different firms." John C. Coates IV, *"Fair Value" as an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. Pa. L. Rev. 1251, 1275 (1999); *see Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Group, Ltd.*, 847 A.2d 340, 356 (Del. Ch. 2004) (defining synergistic value as "the amount of any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a stand-alone going concern, but as part of a larger enterprise, from which synergistic gains can be extracted"). Examples of synergies are "(1) reducing combined overhead by the consolidation of operations [and] (2) raising prices by reducing competition."

Pratt, *Valuing a Business*, at 346. Northwest Investment argues including synergy is impermissible because the fair value of the minority shareholders' stock should be derived from the value of the bank as a stand-alone enterprise rather than the value of the bank if it were to merge with a larger enterprise.

Our statutory definition of "fair value" means "the value of the corporation's shares . . . immediately before the effectuation of the corporate action to which the shareholder objects." Iowa Code § 490.1301(4)(*a*). We have previously said:

> [T]he future opportunities for the company are certainly a consideration in setting the value of the company's stock. . . . Thus, the relevant consideration is what prospects could reasonably have been anticipated as of the date of valuation, not what opportunities are actually realized subsequent to the corporate action.

*Sieg II*, 568 N.W.2d at 798.

The minority shareholders did not present any evidence that a merger is a reasonable prospect in the bank's future or that valuation should be based on anything other than as a stand-alone going concern. *See Ziegeldorf*, 554 N.W.2d at 891. Nevertheless, there is nothing wrong with Maroney basing his opinion, in part, on the aggregations of actual sales data involving mergers and acquisitions. This evidence reflects the market place. While Maroney conceded synergistic value was likely embedded in his data, comparable sales transactions "are still the best empirical evidence generally available to quantify control premium." Pratt, *Valuing a Business*, at 354. Moreover, at least one study suggests merger acquisitions do not command higher premiums in comparison to acquisitions where the corporation will continue to be operated as a stand alone company. Patrick A. Gaughan, *Mergers, Acquisitions, and Corporate Restructurings* 528 (3d ed. 2002) (citing George R. Roach, "Control Premium and Strategic Mergers,"

*Business Valuation Review* (June 1998), pp. 42-49) (explaining the Roach study of control premiums paid between 1992 and 1997 "failed to find any difference in the control premium for those deals in which the merging companies have the same or different Standard Industrial Classification (SIC codes)"); Pratt, *Valuing a Business*, at 351 (same); *see* Coates, 147 U. Pa. L. Rev. at 1331 (noting commentators "have widely varying intuitions about the significance of merger synergies"). Pratt, a leading authority in business valuation, simply cautions analysts to be cognizant of the possible inclusion of synergistic value in the underlying data when selecting and applying a control premium percentage. Pratt, *Valuing a Business*, at 360. Unfortunately, a more principled approach to eliminating synergy is not available because synergy is difficult, if not impossible, to quantify. *See Agranoff v. Miller*, 791 A.2d 880, 899 (Del. Ch. 2001) (acknowledging the difficulty in eliminating synergy from control sales data and admitting the court's "rough approach . . . simply involves shaving some percentage off the top of the available information about control premiums paid").

The record shows Maroney, based on median figures, determined corporations similar to the bank have received control premiums in the range of 36% and 52%. He used 40% in his appraisal of River Cities. As a practical matter, Maroney's conservative approach to value indicates he attempted to remove any marketplace distortions. Although we cannot be certain what effect, if any, synergistic value had on Maroney's calculations, it is more appropriate to accept Maroney's control premium in order to eliminate the minority discount which is proscribed by statute than to make no adjustment at all. *Borruso*, 753 A.2d at 459 n.12; *Casey*, 780 A.2d at 571–72. Therefore, we affirm the district court's decision to accept Maroney's opinion of River Cities' fair value.

**B. Attorney Fees & Witness Expenses.** Northwest Investment also argues the district court erred by not ordering the minority shareholders to pay the corporation's attorney fees and expert witness expenses. Iowa Code section 490.1331(2)(*b*) states:

> The court in an appraisal proceeding may . . . assess the fees and expenses of counsel and experts for the respective parties . . . [a]gainst either the corporation or a shareholder demanding appraisal, in favor of any other party, if the court finds that the party against whom the fees and expenses are assessed acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by the chapter.

We review the denial of a request for attorney fees and expenses under Iowa Code section 490.1331 for abuse of discretion. *Sieg II*, 568 N.W.2d at 807.

Northwest Investment concedes it must prove there was no factual or legal basis for the minority shareholders' demand for $64 a share in order to be even eligible for fees. Northwest Investment has obviously failed to meet this burden. We affirm the district court's denial of attorney fees and expert witness expenses.

**IV. Conclusion.**

We hold the fair value of stock in an appraisal action may include a control premium if the evidence supports the increase in value. The district court properly added a control premium to its valuation of River Cities because transactions involving the sale of financial institutions typically include a large control premium. We therefore affirm the district court's determination that the minority shareholders' shares were worth $64 each immediately before the reverse stock split. Northwest Investment was not entitled to an award for attorney fees and expert witness fees because the minority shareholders did not act arbitrarily or in bad faith.

**AFFIRMED.**