# COURT OF CHANCERY
# OF THE
# STATE OF DELAWARE

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: July 30, 2018
Date Decided: August 15, 2018

Stuart M. Grant, Esquire
Mary S. Thomas, Esquire
Laina M. Herbert, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801

Kevin R. Shannon, Esquire
Berton W. Ashman, Jr., Esquire
Christopher N. Kelly, Esquire
Potter Anderson & Corroon LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19899

Re: *In re Appraisal of AOL Inc.*, Civil Action No. 11204-VCG

Dear Counsel:

On February 23, 2018, I issued a Memorandum Opinion in this appraisal action in which I determined that the fair value of one share of AOL stock was $48.70 as of the merger date.[1] In that Opinion, I noted that our Supreme Court has directed the trial courts to consider a transaction that results in fair market value as persuasive to a finding of statutory fair value.[2] Nonetheless, I concluded that circumstances in the sale of AOL precluded reliance upon the merger price as indicative of fair value.[3] As urged by the parties, I determined the value of an AOL share through a DCF analysis, but expressed concern about certain figures upon

---

[1] *In re AOL Inc.*, 2018 WL 1037450, at *21 (Del. Ch. Feb. 23, 2018) (the "Memorandum Opinion" or the "Mem. Op.").
[2] *Id.* at *8.
[3] *Id.* at *9.

which I relied to calculate the value of unconsummated deals that I found to be part of the operative reality of AOL.[4]

Both parties moved for reargument pursuant to Court of Chancery Rule 59(f). Reargument, in my experience, is rarely efficient or productive. It has become *de rigueur* in appraisal actions, however, and especially so with respect to appraisals relying upon financial determinations of value developed from the reports of partisan experts. No DCF analysis, used to calculate the "exact" value of a corporation, can be sufficiently rigorous that it will not permit a good-faith argument that the value should be otherwise. This, I think, substantiates the wisdom of reliance on deal price, where appropriate; it also may explain the current popularity of motions for reargument. Reargument, however, is properly reserved for occasions where the outcome of a court's reasoning is affected by mistakes of fact or law. Where a motion seeks simply to urge the court to amend application of its discretion, reargument is not appropriate. This Court must resist the desire to achieve the "right" number in a financial analysis—a temptation particularly strong in this, an area not directly within its expertise—by revisiting such discretionary decisions in a way that encourages run-on litigation. Unlike revenge, justice is a dish that is best served warm, and the power of statutory interest further adds to the exigency. Nonetheless, this is that rare case where reargument must be granted.

---

[4] *Id.* at *17–18.

2

In my Memorandum Opinion, I found that two pending transactions—the "Display Deal" and the "Search Deal"—were part of the operative reality of AOL at the time of the transaction.[5] The Petitioners at trial largely withdrew any reliance on their financial expert, and I principally relied, therefore, on the analysis of the Respondent's expert, Dr. Fischel.[6] Fischel did not account for the value of the Display or Search Deals in his DCF, however, and I therefore amended his analysis to include the accretive value of the Deals, as I calculated them.[7] The parties, on reargument, urge me to reconsider my calculation of the value of the Display Deal and the Search Deal, as well as the Perpetuity Growth Rate (the "PGR") applied in my DCF.[8]

I find that the Display Deal value that I used in the overall valuation of AOL was based on an incorrect assumption of fact. Once corrected, I find that the accretive value of $2.57 per AOL share, which I attributed to the Display Deal in the Memorandum Opinion, must be revised. I find that the other matters raised on reargument do not require amendment to my Memorandum Opinion, however. Accordingly, I revise the fair value of a share of AOL stock on the merger date from $48.70 to $47.08. My reasoning follows.

---

[5] *Id.* at *17.
[6] *Id.* at *21.
[7] *Id.* at *17–18.
[8] Interested readers, if any, should consult my Memorandum Opinion for a recitation of the facts and issues resolved in this appraisal; I will not repeat them here.

# I. ANALYSIS

Reargument under Court of Chancery Rule 59(f) is governed by a "flexible" standard and may be granted where the court "overlooked a decision or principle of law that would have a controlling effect or the [c]ourt has misapprehended the law or the facts so that the outcome of the decision would be affected."[9]

### A. *The Microsoft Display Deal*

I find that the value of $2.57 per AOL share for the Display Deal must be revised. In the Memorandum Opinion, I determined that the Display Deal was "at least partially accretive" to AOL's value.[10] I determined the value accretive to my DCF to be $2.57 per share, an amount which I nonetheless found "potentially overstat[ed] fair value" based on the evidence of record.[11]

The Display Deal involved "a ten-year commercial partnership for AOL to run the sales of display, mobile, and video ads on Microsoft properties in the United States and eight international markets."[12] Having found the Display Deal part of the operative reality of AOL and partially accretive, but nonetheless not a part of the Fischel DCF which I largely adopted, I was required to account for it in my valuation. I did so by relying on the Petitioners' representation that "Verizon's [the

---

[9] *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1366994, at *1 (Del. Ch. June 10, 2004) (internal quotation marks omitted).
[10] Mem. Op. at *18.
[11] *Id.*
[12] *Id.* at *15.

4

buyer's] integrated view of Millennial Media calculated its DCF value at up to $600 million or $4.14 per share"[13] and that "the Millennial and Display Deal[s combined] contribute an additional $6.71 per share using Fischel's DCF model."[14] The Millennial Deal was another potential AOL deal that I found was *not* part of AOL's operative reality.[15] I arrived at a value for the Display Deal by using the representations above.[16] I attempted to unbundle the value of the Display Deal by subtracting $4.14 (the Millennial Deal value) from $6.71, the aggregate value of the two deals to AOL as I understood the Petitioners to have represented.[17]

In fact, as both parties now agree, my calculation was erroneous. The "$4.14 per share" referred to *Millennium* shares while the "$6.71 per share" referred to *AOL* shares.[18] The $2.57 figure I arrived at was meaningless, therefore, and I withdraw it.

In connection with this motion for reargument, both experts agree that I should value the Display Deal through amendment to the whole-company DCF analysis of AOL, although they differ on whether the present value of the Display Deal should simply be added to the DCF analysis (Respondent) or whether projected revenue from the Deal should be run through the DCF analysis as part of cash flow

---

[13] Pet'rs' Post-Trial Answering Br. 46 (citing JX2432 at VZ-0024277)
[14] *Id.* at 47 (emphasis omitted); *id.* Ex. 2 (Cornell Revised Rebuttal Report).
[15] Mem. Op. at *17.
[16] *Id.* at *15 n.175.
[17] *Id.* at *15.
[18] July 30, 2018 Reargument Tr. (DRAFT) 30:22–31:9.

(Petitioners).[19] Each party begins with the Fischel DCF model. The Petitioners also rely on an additional affidavit by Professor Cornell, their expert witness, to value the Display Deal at $5.78 per share, or approximately $500 million.[20] Cornell reaches this number by adding four years of Display Deal revenue, based on AOL internal projections, to Fischel's DCF model and applying a 3.5% PGR.[21] Cornell's analysis results in a per-share value of $51.98.[22] This half-a-billion-dollar valuation for the Display Deal,[23] in light of the trial testimony and contemporaneous evidence of the value placed by AOL on the Deal, is fantastic.[24] I note that the "unlevered free cash flows" that AOL projects for the Display Deal are set to consistently decline beginning in 2019, but that these outyear projections are not reflected in the Cornell DCF analysis.[25] Applying a positive and generous PGR to the early cash flows

---

[19] Aff. of Prof. Bradford Cornell in Supp. of Pet'rs' Mot. for Reargument ("Cornell Aff.") ¶¶ 3, 5–6; Aff. of Daniel R. Fischel in Supp. of the Respt's' Mot. for Reconsideration ("Fischel Aff.") ¶ 6 n.9 (explaining why a whole-company DCF analysis reduces reliance on "subjective judgments").

[20] Cornell Aff. ¶¶ 7–8.

[21] JX2331 at tab "DCF"; Cornell Aff. ¶ 7; Cornell Aff. Ex. 2 at tab "Projections" (including a total enterprise value of $4.442 billion).

[22] Cornell Aff. Ex. 2 at tab "Exhibit 2."

[23] *See Agranoff v. Miller*, 791 A.2d 880, 896 (Del. Ch. 2001) ("[T]he use of math should not obscure the necessarily more subjective exercise in judgment that a valuation exercise requires.").

[24] *See, e.g.,* Mem. Op. at *17; JX1844 (May 15, 2015 email from CFO Dykstra) ("The financials need to get locked down soon. We also need to look at this on a cash flow basis. Is this ever going to be cash flow positive?"); JX1825 (May 19, 2015 email from AOL finance employee) ("We are scrubbing the revenue numbers hard but according to the latest we don't make any money really."); Trial Tr. 374:22–24 (AOL CFO of Platforms Bellomo) ("I thought that was an incredibly risky strategy just not only to pull off but the impact that it might have on morale and execution and operations."); Trial Tr. 375:13–17 (AOL CFO of Platforms Bellomo) ("Q. [] And was there a consensus or view about the wisdom of the Microsoft deal in the platforms group before it got approved? A. The senior management team at platforms was largely against the deal.").

[25] Cornell Aff. Ex. 2 at tab "Exhibit 2."

almost certainly overstates value.[26]  The record also indicates that AOL understood contemporaneously that the Display Deal "contained a number of risks,"[27] and Cornell's employment of the whole-company WACC again almost certainly inflates value.[28]  The record cannot support a valuation of the Display Deal that represents, at one point, 18.6% of the free cash flow of AOL.[29]  If I were to employ the Cornell methodology at this stage of the litigation, therefore, I would need to reopen the matter for expert reevaluation of the assumptions underlying the whole-company DCF analysis.  For all these reasons, I decline to adopt the Cornell valuation.

On reargument, Fischel, for reasons just referenced, declines to include the Display Deal in a whole-company analysis without revisiting the PGR, WACC, and other assumptions made under the previous analysis without the Display Deal.[30]  Rather than include the Display Deal revenues in calculating the terminal value and total enterprise value, Fischel adds the present value of the Display Deal free cash flow to the total enterprise value of $3.928 billion, for an implied equity value of $3.984 billion.[31]  Fischel calculates this Display Deal present value from the center

---

[26] JX2331 at tab "DCF."

[27] *See, e.g.*, *supra* note 21 (all citations).

[28] Fischel Aff. ¶ 15 n.21 ("Given the potentially speculative nature of projections for future acquisitions and strategic partnerships, it is not surprising that they would be discounted at a higher rate than the company as a whole.").

[29] *Id.* ¶ 9 ("Under Prof. Cornell's assumptions, in 2018 the Display Deal would account for $42.4 million of AOL's total $228 million in free cash flow, or approximately 18.6% of the company's free cash flows.").

[30] *Id.* ¶ 7.

[31] *Id.* Ex. G.

of a sensitivity matrix located in a set of AOL internal projections for the Display Deal.[32] Through this method, Fischel avoids applying the whole-company PGR and other assumptions to the Display Deal, and arrives at a total per-share value of $46.78.[33] Fischel argues that including the Display Deal revenues in the underlying DCF assumptions would upset the balance of variables upon which those assumptions are based; in other words, that a whole-company analysis including Display Deal cash flows should not apply without revisiting those variables.[34]

In the Memorandum Opinion, I found that the Display Deal was accretive to AOL, and the evidence, while not supporting the Cornell valuation, suggests the value is greater than zero. I note that the Display Deal was projected to incur declining free cash flow starting in 2019 and carried a significant amount of risk. As stated above, running the cash flows from this deal through the whole-company DCF analysis would require revisiting, with expert support, the assumptions underlying the DCF. Therefore, I find that Fischel's method on reargument—adding the present

---

[32] *Id.*; JX2331 at tab "DCF." I explain the details of this sensitivity matrix below.
[33] Fischel Aff. Ex. G.
[34] *Id.* ¶¶ 6–7 ("Prof. Cornell's corrections are inconsistent with my DCF modelling methodology because they rely on subjective judgments that my model specifically rejects, in addition to being inconsistent with observable real world market evidence. For example, my DCF model analyzes AOL as a whole company because it allows me to observe market and financial data for AOL that are only available for the whole company. . . . [P]rof. Cornell 'simply add[s]' the Display Deal projections from 2015 to 2018 to the AOL Management Projections. He applies a 3.5% terminal growth rate after 2018 to the combined projections and discounts these projections at the same weighted average cost of capital ('WACC') I used in my DCF model, which is 9.5%.") (internal citations and quotations omitted).

8

value of the Display Deal, rather than running the revenue numbers through the DCF model assumptions—is the better method here. Like the parties, I rely on AOL's internal projections for the Display Deal in adjusting my valuation.[35] I note that the AOL projections include a sensitivity analysis employing a discount rate ranging from 11% to 19%, substantially greater than the whole-company WACC of 9.5%, and deal lengths of five, seven, and nine-and-a-half years, reflecting the reality that the Display Deal could terminate at the discretion of either party, but in any event after ten years.[36] Assuming a nine-and-a-half-year term and a mid-point 15.0% discount rate, the Display Deal adds $85.1 million in present value.[37] This amount matches the $85.1 million present value chosen by AOL management.[38] Given the risks described, I find that valuation appropriate here. Using Fischel's updated DCF model, and including $85.1 million for the Display Deal,[39] yields an implied equity

---

[35] JX2331 at tab "DCF"; *see Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004) ("Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations.").

[36] *Id.* The Display Deal allowed either party to terminate the deal after five or seven years. *Id;* JX2008 at 31 (establishing a ten-year term in § 13.1 of the Display Deal advertising sales and services agreement).

[37] JX2331 at tab "DCF," cell F36.

[38] *Id.* at cells E30, F36.

[39] I note that I use different potions of the management matrix than did Fischel, because I find it better comports with management's best assumptions; my stand-alone valuation for the Display Deal is significantly higher than Fischel's, therefore.

value of $4.01 billion.[40]  Keeping all other inputs to my DCF stable, that implies a fair value of $47.08 per share.[41]

*B. The Microsoft Search Deal*

I decline to revisit my finding that the Search Deal adds no non-speculative value to AOL.  In the Memorandum Opinion, I found that the Search Deal was, "at least minimally, additive" to the management projections, but that "[t]he record is lacking in a principled way to account for the Search Deal."[42]  Thus, I concluded that fair value "is best expressed by omitting any speculation as to the value to AOL of the pending Search Deal."[43]  Unlike with respect to the Display Deal, the Search Deal valuation (of $0) was not based on an error of fact.

The Petitioners stated in their Post-Trial Opening Brief that "AOL did not produce detailed forecasts for the Search Deal" and, instead of suggesting a value, urged me to "select a number slightly higher than the mid-point share price to account for the Search Deal's benefits."[44]  On reargument, the Petitioners rely on a valuation method they did not raise before; the Petitioners pulled "the metadata supporting [a] graph" from an AOL presentation to Verizon about the Search Deal,

---

[40] Fischel Aff. Ex. G.

[41] As with my DCF valuation in the Memorandum Opinion, I apply the deal price as a rough check on the reasonableness of this valuation based on financial analysis.  To my mind, a per-share valuation of $47.08 is reasonably close to that implied by deal price.

[42] Mem. Op. at *18.

[43] *Id.*

[44] Pet'rs' Post-Trial Opening Br. 56; JX1906 at VZ-0056420 at slide 6 (showing a June 10, 2015 Presentation by AOL to Verizon, including a graph showing Search Deal projections).

arguing that my failure to base my valuation on these implied numbers was erroneous.[45]

I disagree. The record is simply too sparse to attribute non-speculative value to the Search Deal. Neither expert attributed any value to the Search Deal in their DCF analyses.[46] The Petitioners did not argue that I should use the implied cryptic cash flows in valuing the Search Deal until their Motion for Reargument,[47] resulting in a near-silent record and raising real issues of fairness and waiver.[48] Extracted metadata from a graph, presented at the reargument stage, is not a sufficient basis for me to revisit my valuation of the accretive value of the Search Deal. Reargument on this issue is, accordingly, denied.

*C. The Perpetuity Growth Rate*

I determined that the appropriate PGR was 3.5%. Fischel, on whose report I largely relied, originally applied a rate of 3.25%.[49] In the Memorandum Opinion, I found that "a [PGR] of 3.5% more accurately captures AOL's prospects" after the

---

[45] Pet'rs' Mot. for Reargument ¶¶ 11–15 ("The Court attributed no value to the Microsoft Search deal, even though the Court determined that Microsoft Search was part of AOL's operative reality at the time of the Merger . . . and that it was 'additive to the LTP.'").

[46] JX2277 ¶ 86 (Cornell Revised Opening Report); Trial Tr. 232:18–19 (Cornell); JX2255 ¶ 41 n.90 (Fischel Report).

[47] Pet'rs' Mot. for Reargument ¶¶ 13–15.

[48] *Oliver v. Boston Univ.*, 2006 WL 4782232, at *1 (Del. Ch. Dec. 8, 2006) ("New arguments that have not previously been raised cannot be considered for reargument." (internal citations and quotations omitted)). I note that the Respondent argues in post-trial briefing, and again on reargument, that the Petitioners waived attributing any value to the Search Deal by failing to account for it in their expert's report. July 30, 2018 Reargument Tr. (DRAFT) 52:13–53:19.

[49] JX2255 (Fischel Report) ¶ 54 n.104.

Management Projections end, because a PGR of 3.25% would "not accurately capture the trajectories of the two divisions of AOL that were in hypergrowth at the end of the Management Projection period."[50]   The Respondent on reargument again urges me to adopt a PGR of 3.25%.[51]   That Motion is denied; I explained my rationale in my Memorandum Opinion.  I may have gotten it wrong, but that is a matter for appeal, not reargument.[52]

As stated above, there is a tension between any judge's natural desire to create a "perfect" valuation and the need for litigants' economy and finality.  I rely on my rationale in the Memorandum Opinion and deny the Respondent's Motion for Reargument on this matter.

## II. CONCLUSION

I find that my assignment of value to the Display Deal of $2.57 per AOL share, additive to the DCF analysis, was based on an error of fact.  To that extent, both parties' Motions are granted.  Consequently, I revise the fair value of an AOL share on the merger date from $48.70 to $47.08.  The remaining portions of the Motions

---

[50] Mem. Op. at *19.

[51] I note that the Respondent uses the risk-free-rate as an anchor but does not argue for its adoption here.  Resp't's Mot. for Reconsideration ¶¶ 17–18 ("Nor did the Court's analysis take account of the Supreme Court's ruling in *DFC*, where the Chief Justice observed that the risk-free rate (here, 2.92%) might be the appropriate 'ceiling' for a perpetual growth rate" but the "Respondent does not ask the Court to reduce Fischel's 3.25% perpetual growth rate to the risk-free rate").

[52] If I had followed the Cornell model and applied the company-wide assumptions to the Display Deal projections, there would be a much stronger case to revisit the PGR, among other inputs.

are denied. The parties should submit an appropriate form of order in accordance with this Letter Opinion.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III